**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF TENNESSEE**
**NASHVILLE DIVISION**

| | | |
|---|---|---|
| **BRIAN DUNKLEY,** | ) | |
| | ) | |
| **Petitioner,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 3:17-cv-01508** |
| | ) | **Judge Trauger** |
| **KENNETH HUTCHISON, Warden,** | ) | |
| | ) | |
| **Respondent.** | ) | |

## MEMORANDUM

Brian Dunkley is serving a 25-year prison sentence based on his conviction by a Davidson County, Tennessee jury of conspiracy to commit first-degree murder. On November 30, 2017, he filed his pro se petition for the writ of habeas corpus pursuant to 28 U.S.C. § 2254. (Doc. No. 1.) The respondent filed an answer to the petition (Doc. No. 13) and the state court record (Doc. No. 12), and the petitioner filed a reply to the respondent's answer (Doc. No. 16). Over the petitioner's objection, the respondent was granted leave to file a sur-reply. (Doc. No. 18.) The petitioner thereafter filed a brief response to the sur-reply. (Doc. No. 22.)

This matter is ripe for the court's review, and the court has jurisdiction. The respondent does not dispute that the petition is timely, that this is the petitioner's first Section 2254 petition related to this conviction, and that the claims of the petition have been exhausted. (Doc. No. 13 at 1–2.) Having reviewed the petitioner's arguments and the underlying record, the court finds that an evidentiary hearing is not required. As explained below, the petitioner is not entitled to relief under Section 2254, and his petition will therefore be denied.

# I. PROCEDURAL HISTORY

In 2011, the petitioner was tried on charges including conspiracy to commit the first-degree murder of his ex-wife, attempted first-degree murder, and attempted aggravated battery. He was convicted of conspiracy to commit first-degree murder and acquitted of attempted first-degree murder and attempted aggravated battery. (Doc. No. 12-3 at 65–67.) He was sentenced to 25 years in the Tennessee Department of Correction with parole eligibility after 30% of his sentence is served. (*Id.* at 65.) His subsequent motion for a new trial was denied by the trial court. (*Id.* at 94–101.)

On direct appeal, the Tennessee Court of Criminal Appeals (TCCA) affirmed the petitioner's conviction and sentence. *State v. Dunkley*, No. M2012-00548-CCA-R3-CD, 2014 WL 2902257 (Tenn. Crim. App. June 25, 2014). The Tennessee Supreme Court denied discretionary review on November 20, 2014. (Doc. No. 12-27.)

The petitioner, through counsel, filed a petition for post-conviction relief on September 14, 2015. (Doc. No. 12-28 at 51–90.) Following an evidentiary hearing, the post-conviction trial court denied relief. (Doc. No. 12-30 at 68–79.)

On June 5, 2017, the TCCA affirmed the denial of post-conviction relief. *Dunkley v. State*, No. M2016-00961-CCA-R3-PC, 2017 WL 2859008 (Tenn. Crim. App. June 5, 2017). The petitioner filed for permission to appeal to the Tennessee Supreme Court, which was denied on November 16, 2017. (Doc. No. 12-38.) Shortly thereafter, the petitioner filed his pro se petition under Section 2254 in this court.

# II. STATEMENT OF FACTS

A. <u>Evidence at Trial</u>

The petitioner was tried on charges stemming from his role in a conspiracy to kill Kristi Dunkley, who was his wife at the time of the conspiracy. The other conspirators were Stephanie

2

Frame, who met the petitioner in 2005 and entered into a sexual relationship with him in 2006, while he was still married to the victim; William Miller, Frame's second cousin who knew the petitioner and had spent time with him at holiday gatherings in late 2007; and Donte Chestnut, an acquaintance of Frame's. Miller, Chestnut, and the petitioner were tried together, convicted, and sentenced to prison.

Kristi Dunkley testified that she married the petitioner in 1995 and that they had endured several periods of separation before moving back in together in April 2008. *State v. Dunkley*, 2014 WL 2902257, at *12. They separated finally in September 2008, and "[s]he stated that their separation was 'ugly,' and she left their marital home, taking her two children with her, one of wh[om] was also Defendant Dunkley's daughter." *Id.* She testified that "they had since divorced and she had reacquired her maiden name, Alderson. Ms. Dunkley confirmed that her uncle, Tim Alderson, was Ms. Frame's stepfather." *Id.* She had been aware of the petitioner's affair with Frame, which contributed to the divorce. *Id.*

On July 19, 2006, the Dunkleys had taken out a $50,000 life insurance policy on the victim, listing the petitioner as the beneficiary. This "permanent life insurance policy" was in force at the same time as a twenty-year term life insurance policy in the amount of $250,000, which also insured the victim's life and listed the petitioner as beneficiary. These policies listed the petitioner as the owner and, therefore, did not allow the victim to control the beneficiary designation. *Id.* at *2–3.

After spending time together during Thanksgiving and Christmas of 2007 at Frame's family gatherings, Miller and the petitioner began to discuss killing the victim. Frame's trial testimony[1] established the following sequence of events, as summarized by the TCCA:

> [I]in January 2008, she took Defendant Dunkley to Defendant Miller's mother's house, where the two men met outside, while Ms. Frame went inside the house. She stated that, after his discussion with Defendant Miller, Defendant Dunkley told her that Defendant Miller "was going to be the one to take [Ms. Dunkley] out[ ]" and that he had given to Defendant Miller a picture of Ms. Dunkley, with her work address, home address, and information about two vehicles that Ms. Dunkley drove. Ms. Frame stated that, in early 2008, Defendant Dunkley showed Ms. Frame that same photograph of Ms. Dunkley and the information attached to it.
>
> Ms. Frame testified that, later in January 2008, Defendant Dunkley said to her, "To show you how serious I am [about killing Ms. Dunkley], I gave [Defendant Miller] one of my guns." Ms. Frame recalled that Defendant Dunkley then showed her an empty weapon holster in his bedside drawer. Ms. Frame said she was "aware" of the communication between the two men at this time but that she was getting information about their communication from Defendant Dunkley. Defendant Dunkley told Ms. Frame that Defendant Miller was "watching" Ms. Dunkley to get information about "what's going on in her life."
>
> Ms. Frame testified that Ms. Dunkley "moved back in with [Defendant Dunkley] in late March, beginning of April of 2008 so actually [Defendant Miller] had come to a halt." Ms. Frame stated that in the summer of 2008, Defendant Dunkley told her that he had asked Defendant Miller why he had stopped watching Ms. Dunkley. According to Defendant Dunkley, Defendant Miller responded that he had stopped because Ms. Dunkley had moved back in with Defendant Dunkley, and Defendant Dunkley responded, "you don't stop until I tell you to stop."
>
> Ms. Frame testified that she invited Defendant Miller over for dinner in August 2008. She told Defendant Miller that she knew what he and Defendant Dunkley "were up to[,]" and Defendant Miller responded that he was "skeptical of doing the job" because he was not sure Defendant Dunkley would pay him. Ms. Frame assured him that Defendant Dunkley was "trustworthy" but that Defendant Miller would not get paid until "it was done and ... the insurance [was] cashed out...." Defendant Miller wanted to know how long payment would take, and Ms. Frame asked Defendant Dunkley, who told her it would take no longer than thirty days.

---

[1]    Although charges were pending against Frame at the time of the petitioner's trial, she denied having any agreement with the state to testify or anticipating any benefit to herself as a result of her testimony as a witness for the state. (Doc. No. 12-19 at 139.) She testified at the petitioner's hearing on motion for new trial that "[t]he reason for [her] testimony is so that the truth would've gotten out." (*Id.* at 140.)

4

Ms. Frame testified that she had a conversation with Defendant Miller about the gun Defendant Dunkley had given him. She stated that this was "during the times we [were] actually outside [Ms. Dunkley's] work building watching [her]." Defendant Miller told her that the gun given to him by Defendant Dunkley had been "apprehended by the police officers during an arrest in March 2008." Ms. Frame stated that, at some point in August 2008, she gave Defendant Miller her daughter's cellular telephone because "his cellular service was disconnected." Ms. Frame testified that during that time, she was using a T-Mobile "Shadow" telephone, which contained the SIM card she eventually transferred to the G-1 telephone [she purchased in January 2009].

Ms. Frame was asked to explain text messages contained in the report admitted into evidence that were sent between [her] and Defendant Dunkley. The jury was furnished with a copy of the report while Ms. Frame testified about their content. She testified that on August 20, 2008, she and Defendant Dunkley exchanged text messages in regards to giving Defendant Miller directions to Ms. Dunkley's home and work. She stated that on August 22, 2008, she received text messages from Defendant Dunkley "giving [Ms. Dunkley's] schedule[,]" including when the doors to her work building would be locked, where she parked her car, where security cameras were located, and what time Ms. Dunkley went in to work. Defendant Dunkley also sent text messages describing the interior of Ms. Dunkley's work building.

Referencing the report, Ms. Frame stated that on September 19, 2008, Defendant Dunkley sent her multiple text messages explaining Ms. Dunkley's schedule and where she parked her car at work. She stated that Defendant Dunkley sent a text message from inside Ms. Dunkley's work building, where he was getting his hair done, indicating that he would give information about where Ms. Dunkley's car was parked and how full the parking lot was. Ms. Frame testified that she and Defendant Miller "were walking throughout the area" where Ms. Dunkley worked and that they spotted a security camera on a building. Ms. Frame sent a text message with this information to Defendant Dunkley. Ms. Frame explained that she and the two men were "interested" in where Ms. Dunkley parked her car "[s]o that it would be an easy and simple drive for [Defendant Miller to kill Ms. Dunkley] without being noticed."

Ms. Frame testified that on September 20, 2008, Defendant Dunkley sent her a text message that said, "It needs to happen. Don't know how much longer I can deal." Ms. Frame explained that "it" meant Defendant Miller killing Ms. Dunkley. Ms. Frame testified that Defendant Dunkley sent more text messages detailing Ms. Dunkley's whereabouts on September 21, and gave more information about Ms. Dunkley's work building and which doors were unlocked. Defendant Dunkley sent Ms. Frame another text message on September 21 saying, "This bitch is crazy. [Defendant Miller killing Ms. Dunkley] needs to happen ASAP. Is [Defendant Miller] for real." Ms. Frame testified that she had the keys to Ms. Dunkley's car

and that she asked Defendant Dunkley if Defendant Miller could "wait inside [Ms. Dunkley's] car and get her that way[,]," to which Defendant Dunkley replied, "I don't think [Defendant Miller will] be able to wait in the ride. Maybe out on the side." On September 24, 2008, Defendant Dunkley sent more text messages updating the "status" of Ms. Dunkley's work schedule, and saying, "Follow her. She told me she was working."

*Id.* at *5–7.

Frame testified that the petitioner sent her additional text messages describing the urgent need to have the victim killed. She further testified that her sexual relationship with the petitioner was ongoing at this time and that "she wanted to kill Ms. Dunkley because Defendant Dunkley 'said that that was the only way we could be happy and together.'" *Id.* at *11. Frame testified that she provided another gun to Miller in January 2009 but that Miller was concerned about the arrangement because he was to receive $50,000, if he killed the victim, but "was not getting paid any money up front." *Id.* at *7. Frame offered Miller money up front, and the petitioner stated that he would provide money up front or let Miller hold the title to the petitioner's vehicle, a Hummer. Once Miller was enticed to resume the conspiracy, the petitioner, Frame, and Miller conferred about a time to kill the victim when her children would not be present in the apartment with her. *Id.* at *8.

Early on the morning of February 8, 2009, Frame and Miller went to the victim's apartment, where Miller attempted to force the front door open with a sledgehammer. When the door did not open after being hit once with the sledgehammer, Frame and Miller fled. They decided to try again the next day, but at a time when they could follow the victim and her boyfriend into the apartment "so there won't be any mistakes." *Id.* at 8–9. Frame testified to her surveillance efforts and communications with the petitioner over the next two days, as follows:

Ms. Frame testified that, on February 9, 2009, she and Defendant Dunkley discussed via text message that having his daughter with him at the time of the murder would be a "good alibi" for him. Ms. Frame testified that on February 10,

she and Defendant Miller followed Ms. Dunkley while she took her oldest daughter to school and her younger daughter to Ms. Dunkley's mother's house. Ms. Frame stated that, in a rental car, she and Defendant Miller continued to follow Ms. Dunkley throughout the day. After following Ms. Dunkley, Ms. Frame sent text messages to Defendant Dunkley with "all of that information" about where they had followed Ms. Dunkley. Ms. Frame explained that she rented a vehicle because she thought Ms. Dunkley might know what her vehicle looked like. Ms. Frame stated that she communicated this as well to Defendant Dunkley. The receipt from the car rental was admitted into evidence.

*Id.* at *9.

On February 17, 2009, the petitioner and Frame exchanged text messages in which the petitioner, "referring to his divorce proceedings with Ms. Dunkley, stated that he was 'going to lose everything' to Ms. Dunkley," to which Frame replied that "she had told Defendant Miller that 'it [had] to happen before Friday.'" *Id.* When Miller could not adhere to this schedule, Frame contacted Chestnut, one of her clients, and asked him "if he knew someone that would want to make $10,000." *Id.* at 9–10. Frame testified that "she made it 'very clear' to Mr. Chestnut that she wanted to pay someone to do a killing." *Id.* at 11.

Chestnut contacted his brother-in-law, Herman Marshall, who agreed to do the killing but then contacted police, who subsequently recorded a telephone call between Marshall and Frame in which Frame confirmed the plan to kill the victim and arranged to meet Marshall in a hospital parking lot. At that meeting, under police surveillance, Frame provided Marshall with a handgun, a body suit, a hairnet, a can of pepper spray, and a picture of the victim. She then drove Marshall to the victim's apartment complex to show him its location and gave him $200. Immediately after this meeting, Marshall met with the police and gave them the $200. *Id.* at 2.

Frame was then taken into custody and interviewed at the police station, where Detective Tarkington "testified that initially she did not provide truthful information about the murder-for-hire scheme or her involvement." *Id.* at 4. However,

> Detective Tarkington stated that, while in jail, Ms. Frame placed or received several telephone calls that were recorded. He testified that he monitored the telephone calls and that Ms. Frame mentioned Defendant Dunkley's and Defendant Miller's names throughout those calls. He stated that she mentioned Defendant Miller as being part of the scheme, and she stated that he had received $700 to take part in the scheme. Detective Tarkington listened to Ms. Frame ask the person on the other end of the call to "three-way call" Defendant Miller, and, once Defendant Miller was on the line, Ms. Frame asked him to return the money he had been paid. It was also during that call that Detective Tarkington learned of the existence of the Shadow telephone owned by Ms. Frame. After securing the Shadow phone from Ms. Frame's mother, Detective Tarkington stated that he turned the Shadow and G-1 telephones over to Detective Weaver for the extraction of reports from the telephones.

*Id.* Both Detective Tarkington and Lieutenant Patrick Taylor were involved with monitoring the meeting between Frame and Marshall in the hospital parking lot on March 2, 2009. Lt. Taylor testified "that he observed the interaction between Ms. Frame and Mr. Marshall, and he witnessed Ms. Frame's green SUV pull into the parking lot, as well as a black Hummer. Lieutenant Taylor testified that he later learned that Defendant Dunkley owned a Hummer." *Id.* at *5. Kevin Sherrell, a friend of the Dunkleys who later became romantically involved with the victim, confirmed the petitioner's ownership of a black Hummer that had been an issue during the Dunkleys' divorce proceedings. *Id.* at *12, 13.

    B. <u>Post-Conviction Testimony</u>

    The following recitation of the testimony received at the petitioner's post-conviction evidentiary hearing (Doc. No. 12-31) is taken from the TCCA's opinion affirming the denial of post-conviction relief (Doc. No. 12-35):

> At the post-conviction hearing, trial counsel testified that she was retained by the Petitioner in August 2010 and that trial was set for November 2010. She reviewed all of the discovery, including the text messages, and she met with the Petitioner several times. Trial counsel testified that she discussed the text messages with the Petitioner multiple times and that the Petitioner was aware of the content of the text messages. Trial counsel testified that she discussed the weight of the evidence, including the text messages, with the Petitioner but did not recall ever telling him that the State had a strong case against him. Trial counsel described the text

messages as "damning." According to trial counsel, the Petitioner, who had previously worked for the State in the field of information technology and who was educated and intelligent, wanted to be exonerated and had always wanted to go to trial. Trial counsel discussed the Petitioner's exposure with him but did not recall ever recommending that he pursue a plea agreement. Neither did she ever express concern to his mother or to Joslynn Williams-Dunkley, his girlfriend [at the time of trial whom he later married], regarding the strength of the State's case, because she did not want to affect their testimony in the event she chose to call them to testify.

According to trial counsel's testimony, on the morning of trial, she asked the Assistant District Attorney General about any offers to settle the case. Trial counsel stated that the prosecutor responded with an offer to recommend a sentence that was either at the bottom of the range for a Class A felony or the top of the range for a Class B felony in exchange for a guilty plea. Trial counsel spoke to the Petitioner about the offer for approximately five minutes. During this time, she did not discuss the strength of the State's case or the Petitioner's potential range of punishment. While trial counsel believed that entering a plea would be in the Petitioner's best interest, she did not share her opinion with him, make any recommendation regarding a plea, or ask for additional time to consider the offer in order to have a thorough discussion with the Petitioner. The Petitioner, with no guidance from trial counsel, responded he would consider serving a six-year sentence. The State promptly rejected this offer, and trial commenced.

According to trial counsel, Ms. Frame had two telephones with inculpatory evidence. Trial counsel tried to suppress the older text messages on the "shadow" phone based on Tennessee Rule of Evidence 404 and moved to dismiss the indictment and suppress evidence from the G-1 phone based [on] the State's loss or destruction of evidence, pursuant to *State v. Ferguson*, 2 S. W. 3d 912 (Tenn. 1999). Trial counsel admitted that she had misunderstood the burden of proof regarding the *Ferguson* issue and did not present any evidence at the motions hearing. Trial counsel's motions were denied, and she re-filed the motions closer to trial. In preparation for the second hearing on the motion to suppress and motion to dismiss, trial counsel issued a subpoena to Ms. Frame's mother, directing Ms. Frame's mother to bring the G-1 telephone with her. The telephone was made available to the defense on the morning of the hearing. Trial counsel then struck the motions. At the post-conviction hearing, she agreed that the telephone had been in use and was not preserved by law enforcement. Trial counsel testified that she had been concerned regarding the destruction of voicemails and pictures but had never considered investigating the applications present on the telephone. She agreed that the Petitioner never specified what information on the telephone could have been helpful to him and that it was "pure speculation" and "essentially a fishing expedition" to assert that the telephone contained exculpatory information.

Trial counsel did not challenge the warrants for records related to Ms. Frame's two telephones or the judicial subpoena for the records related to the Petitioner's

telephones. She agreed with the prosecution that the Petitioner would not have had standing to contest the warrants for Ms. Frame's telephones and that the State could have gotten new subpoenas if the subpoenas for the Petitioner's telephones had been found not to comply with [the] statute. Ms. Frame's "shadow" telephone contained text messages which included pictures of the Petitioner sent from a number corresponding to one of his telephones, and trial counsel agreed that it would have been "extremely difficult" to challenge the premise that he was the one sending photos of himself.

Trial counsel's strategy was to shift the blame to Ms. Frame and to advance a theory that she had fabricated the text messages as a result of a delusional obsession with the Petitioner. Trial counsel testified that she could not recall whether she had known that the prosecution would introduce evidence that a Hummer was circling the parking lot of the hospital while Ms. Frame met with Mr. Marshall. She recalled that the Petitioner wanted her to question his girlfriend, Ms. Williams-Dunkley, regarding the allegation. Trial counsel chose not to call Ms. Williams-Dunkley because the State possessed evidence calling Ms. Williams-Dunkley's credibility into question, including a civil judgment against her related to the sale of the Petitioner's Hummer, a finding from the divorce court that she had benefited from the Petitioner's liquidation of his 401K, and recorded calls to the jail in which she spoke with the Petitioner regarding keeping the Hummer. Trial counsel acknowledged that the records from the Petitioner's cell phone indicated that he was in Goodlettsville and not at Skyline hospital around the time of the meeting between Ms. Frame and Mr. Marshall.

Over the Petitioner's objection, Pamela Anderson, the Assistant District Attorney General who was representing the State at the post-conviction hearing, elected to testify. Ms. Anderson, who had prosecuted the Petitioner, stated that the prosecution had a strong case. Ms. Anderson testified that the State was entirely unwilling to allow any of the defendants on trial that day—Mr. Chestnut, Mr. Miller, or the Petitioner—to be severed from the other defendants, and she added that the State was not willing to entertain a plea to a reduced charge. We note that the Petitioner was charged with and acquitted of attempted aggravated burglary and attempted first degree murder. According to Ms. Anderson, the State never extended an offer to the Petitioner, and any plea negotiations would have been contingent on both the victim's approval and the entry of guilty pleas to the indicted offenses from all the other defendants on trial. Ms. Anderson agreed that the State "would have likely settled it" if the victim had agreed to the plea and if the other co-defendants had decided to plead guilty. Ms. Anderson stated that counsel for a co-defendant opened plea discussions on the day of trial. Ms. Anderson had told trial counsel that if the Petitioner were to offer to plead guilty to the indicted offense,[fn] the State "might be willing" to agree to the minimum sentence in the range. Ms. Anderson confirmed that trial counsel returned with a six-year offer, which the State rejected out of hand. She agreed with trial counsel that the trial judge in the case generally approved plea agreements reached by the parties.

10

[fn] Ms. Anderson testified that the State would not have reduced the charges from the "indicted offense" and that if the Petitioner had offered to plead guilty to the "indicted offense," the State might have considered a fifteen-year sentence. She recalled that the Petitioner might have also been charged with attempted first degree murder and stated "we never got to any discussions about that." She clarified that the State would have considered a fifteen-year sentence in exchange for a guilty plea to a Class A felony.

Detective Norris Tarkington testified that Ms. Frame was arrested around 8:30 p.m. on March 2, 2009, and that he ultimately seized both the G-1 telephone and the "shadow" phone which she had used during the relevant period. One of the telephones was in Ms. Frame's possession, and he learned of the other while monitoring Ms. Frame's telephone calls from jail. The second telephone was in the possession of Ms. Frame's mother, and after law enforcement retrieved information from the telephones, he returned one of them to Ms. Frame's mother.

Detective Tarkington testified that he could not find video surveillance of the Hummer in the parking lot because the cameras were too far away. He testified that Skyline hospital is in Nashville. Detective Tarkington testified regarding some of the communications between the Petitioner and Ms. Williams-Dunkley that would have affected her credibility. Ms. Williams-Dunkley had written the Petitioner, "I have got your back, baby," and told him, "I'm not blinded by love, I'm engulfed in it." Ms. Williams-Dunkley also wrote, "I want to harm someone like I've been harmed. I want to reach deep into someone's chest and pull out their pulsating heart from its rotting cavity," and she assured the Petitioner, "Revenge will be mine." She also referenced in a letter a plot that she and the Petitioner had concocted during a jail call, in which they planned to fabricate charges against the victim's uncle so that he would be arrested and the Petitioner could beat him up in jail.

The Petitioner, who had owned a consulting company and performed information technology work for the State of Tennessee prior to his conviction, hired trial counsel because his previous counsel, who represented him for four or five months, had not responded to his communications. The Petitioner testified that trial counsel never discussed his exposure or the State's theory of the evidence, including evidence that he stood to profit through the victim's death due to an insurance policy. The Petitioner had a prior criminal charge to which he pled guilty and for which he obtained diversion. He also had experience in divorce court. The Petitioner was aware that "there would be text messages," but trial counsel never reviewed the text messages line-by-line or discussed them. Trial counsel gave Petitioner the impression that the State had only screen shots of the text messages, that some of these did not have an identifying telephone number and were "outside the scope of the charges," and that the messages "wouldn't be anything to worry about" because they would not be admissible. Trial counsel also told him that the defense could discredit Ms. Frame's testimony. The Petitioner had the impression that trial counsel had "everything under control," and he had no concern that he

would be found guilty. He did not see all of the text messages until trial, although his first attorney had given him two sheets of paper with some of the text messages on them. The Petitioner agreed that he was aware of the text messages because he had sent them. He also acknowledged that he actively deleted text messages off his own telephone and that the "majority" of the text messages introduced at trial were ones he had sent and received.

On the morning of trial, trial counsel told him "something about" fifteen years, but he thought that the fifteen-year sentence was part of Ms. Frame's plea agreement. He did not think that the State had offered him a plea agreement, but he told trial counsel that he would agree to serve six years. The Petitioner testified that, if he had understood the State's case, he would have taken a plea offer of fifteen years. Trial counsel never suggested to him that he should plead guilty.

The Petitioner testified that the police failed to preserve the G-1 telephone. According to the Petitioner, the telephone could have contained an application giving the user the capability to modify text messages, and evidence of such an application on the G-1 telephone could have discredited Ms. Frame's testimony.

The Petitioner testified that he lived in Goodlettsville with Ms. Williams-Dunkley between January and April 2009 and that his home in Goodlettsville was located approximately ten miles from Skyline hospital. He was surprised at the testimony implying he was at the hospital during the meeting between Ms. Frame and Mr. Marshall, and he told trial counsel that he had been at home and that his vehicle had OnStar. He also told her that Ms. Williams-Dunkley could confirm that he had been at home and could confirm that he was not driving his Hummer at the time because she was using it. He acknowledged that Ms. Williams-Dunkley had written the statements read into the record by Detective Tarkington. The Petitioner acknowledged that he had been convicted of aggravated perjury for misrepresenting the fate of the Hummer in divorce court.

*Dunkley v. State*, 2017 WL 2859008, at *2–5.

## III. CLAIMS PRESENTED FOR REVIEW

The petitioner's pro se petition in this court asserts the following claims:

(1) Multiple trial court errors violated his right to due process and a fair trial:

    (a) The trial court erroneously granted the state's motion regarding the admission of text messages relating to the offense;

    (b) The trial court erroneously denied the motion for new trial when the state failed to prove beyond a reasonable doubt that the petitioner was guilty of conspiracy to commit first-degree murder;

> (c) The trial court erroneously denied the motion for new trial based on the newly discovered evidence that Frame made statements at her parole hearing that differed from her sworn testimony at trial.

(2) The petitioner's conviction is based on insufficient evidence, in violation of his right to due process.

(3) Trial counsel provided ineffective assistance of counsel in several ways:

> (a) Trial counsel failed to recommend that the petitioner accept the plea and sentence proposed by the state;
>
> (b) Trial counsel failed to adequately argue the motion to dismiss based on lost or destroyed evidence;
>
> (c) Trial counsel failed to file a motion to suppress cell phone data from Frame's cell phones;
>
> (d) Trial counsel failed to file motions to exclude the phone data obtained by judicial subpoenas;
>
> (e) Trial counsel failed to emphasize proof that would have rebutted the state's assertion that the petitioner was "hovering" around Skyline Hospital.

(4) Cumulative error.

(Doc. No. 1; Doc. No. 16 at 5.)

## IV. LEGAL STANDARD

The statutory authority of federal courts to issue habeas corpus relief for persons in state custody is provided by 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA). A federal court may grant habeas relief to a state prisoner "only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). Upon finding a constitutional error on habeas corpus review, a federal court may only grant relief if it finds that the error "had substantial and injurious effect or influence in determining the jury's verdict." *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993); *Peterson v. Warren*, 311 F. App'x 798, 803–04 (6th Cir. 2009).

13

AEDPA was enacted "to reduce delays in the execution of state and federal criminal sentences, particularly in capital cases . . . and 'to further the principles of comity, finality, and federalism.'" *Woodford v. Garceau*, 538 U.S. 202, 206 (2003) (quoting *Williams v. Taylor*, 529 U.S. 362, 436 (2000)). AEDPA's requirements "create an independent, high standard to be met before a federal court may issue a writ of habeas corpus to set aside state-court rulings." *Uttecht v. Brown*, 551 U.S. 1, 10 (2007) (citations omitted). As the Supreme Court has explained, AEDPA's requirements reflect "the view that habeas corpus is a 'guard against extreme malfunctions in the state criminal justice systems,' not a substitute for ordinary error correction through appeal." *Harrington v. Richter*, 562 U.S. 86, 102–03 (2011) (quoting *Jackson v. Virginia*, 443 U.S. 307, 332 n.5 (1979)). Where state courts have ruled on a claim, AEDPA imposes "a substantially higher threshold" for obtaining relief than a de novo review of whether the state court's determination was incorrect. *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007) (citing *Williams v. Taylor*, 529 U.S. 362, 410 (2000)).

Specifically, a federal court may not grant habeas relief on a claim rejected on the merits in state court unless the state decision was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(1), (d)(2). A state court's legal decision is "contrary to" clearly established federal law under Section 2254(d)(1) "if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. at 412–13. An "unreasonable application" occurs when "the state court identifies the correct legal principle from [the Supreme] Court's

decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413. A state court decision is not unreasonable under this standard simply because the federal court finds it erroneous or incorrect. *Id.* at 411. Rather, the federal court must determine that the state court's decision applies federal law in an objectively unreasonable manner. *Id.* at 410–12.

Similarly, a district court on habeas review may not find a state court factual determination to be unreasonable under Section 2254(d)(2) simply because it disagrees with the determination; rather, the determination must be "'objectively unreasonable' in light of the evidence presented in the state court proceedings." *Young v. Hofbauer*, 52 F. App'x 234, 236 (6th Cir. 2002). "A state court decision involves 'an unreasonable determination of the facts in light of the evidence presented in the State court proceeding' only if it is shown that the state court's presumptively correct factual findings are rebutted by 'clear and convincing evidence' and do not have support in the record." *Matthews v. Ishee*, 486 F.3d 883, 889 (6th Cir. 2007) (quoting Section 2254(d)(2) and (e)(1)); *but see McMullan v. Booker*, 761 F.3d 662, 670 & n.3 (6th Cir. 2014) (observing that the Supreme Court has not clarified the relationship between (d)(2) and (e)(1) and the panel did not read *Matthews* to take a clear position on a circuit split about whether clear and convincing rebutting evidence is required for a petitioner to survive (d)(2)). Moreover, under Section 2254(d)(2), "it is not enough for the petitioner to show some unreasonable determination of fact; rather, the petitioner must show that the resulting state court decision was 'based on' that unreasonable determination." *Rice v. White*, 660 F.3d 242, 250 (6th Cir. 2011).

The standard set forth in 28 U.S.C. § 2254(d) for granting relief on a claim rejected on the merits by a state court "is a 'difficult to meet' and 'highly deferential standard for evaluating state-court rulings, which demands that state-court decisions be given the benefit of the doubt.'" *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011) (quoting *Richter*, 562 U.S. at 102, and *Woodford v.*

*Visciotti*, 537 U.S. 19, 24 (2002) (per curiam)). The petitioner bears the burden of proof. *Pinholster*, 563 U.S. at 181.

Even that demanding review, however, is ordinarily only available to state inmates who have fully exhausted their remedies in the state court system. 28 U.S.C. §§ 2254(b) and (c) provide that a federal court may not grant a writ of habeas corpus on behalf of a state prisoner unless, with certain exceptions, the prisoner has presented the same claim sought to be redressed in a federal habeas court to the state courts. *Pinholster*, 563 U.S. at 182; *Kelly v. Lazaroff*, 846 F.3d 819, 828 (6th Cir. 2017) (quoting *Wagner v. Smith*, 581 F.3d 410, 417 (6th Cir. 2009)) (petitioner must present the "same claim under the same theory" to the state court). This rule has been interpreted by the Supreme Court as one of total exhaustion, *Rose v. Lundy*, 455 U.S. 509 (1982), meaning that each and every claim set forth in the federal habeas corpus petition must have been presented to the state appellate court. *Picard v. Connor*, 404 U.S. 270 (1971); *see also Pillette v. Foltz*, 824 F.2d 494, 496 (6th Cir. 1987) (exhaustion "generally entails fairly presenting the legal and factual substance of every claim to all levels of state court review"). Moreover, the substance of the claim must have been presented as a federal constitutional claim. *Gray v. Netherland*, 518 U.S. 152, 162–63 (1996).

The procedural default doctrine is ancillary to the exhaustion requirement. *See Edwards v. Carpenter*, 529 U.S. 446 (2000) (noting the interplay between the exhaustion rule and the procedural default doctrine). If the state court decides a claim on an independent and adequate state ground, such as a procedural rule prohibiting the state court from reaching the merits of the constitutional claim, a petitioner ordinarily is barred from seeking federal habeas review. *Wainwright v. Sykes*, 433 U.S. 72, 81–82 (1977*); see also Walker v. Martin*, 562 U.S. 307, 315 (2011) ("A federal habeas court will not review a claim rejected by a state court if the decision of

16

the state court rests on a state law ground that is independent of the federal question and adequate to support the judgment"); *Coleman v. Thompson*, 501 U.S. 722 (1991) (same). If a claim has never been presented to the state courts, but a state court remedy is no longer available (e.g., when an applicable statute of limitations bars a claim), then the claim is technically exhausted, but procedurally barred. *Coleman*, 501 U.S. at 731–32.

If a claim is procedurally defaulted, "federal habeas review of the claim is barred unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice." *Coleman*, 501 U.S. at 750. The burden of showing cause and prejudice to excuse defaulted claims is on the habeas petitioner. *Lucas v. O'Dea*, 179 F.3d 412, 418 (6th Cir. 1999) (citing *Coleman*, 501 U.S. at 754). "'[C]ause' under the cause and prejudice test must be something external to the petitioner, something that cannot fairly be attributed to him[;] . . . some objective factor external to the defense [that] impeded . . . efforts to comply with the State's procedural rule." *Coleman*, 501 U.S. at 753 (emphasis in original). Examples of cause include the unavailability of the factual or legal basis for a claim or interference by officials that makes compliance "impracticable." *Id.* To establish prejudice, a petitioner must demonstrate that the constitutional error "worked to his actual and substantial disadvantage." *Perkins v. LeCureux*, 58 F.3d 214, 219 (6th Cir. 1995) (quoting *United States v. Frady*, 456 U.S. 152, 170 (1982)); *see also Ambrose v. Booker*, 684 F.3d 638, 649 (6th Cir. 2012) (finding that "having shown cause, petitioners must show actual prejudice to excuse their default"). "When a petitioner fails to establish cause to excuse a procedural default, a court does not need to address the issue of prejudice." *Simpson v. Jones*, 238 F.3d 399, 409 (6th Cir. 2000). Likewise, if a petitioner cannot establish prejudice, the question of cause is immaterial.

17

Because the cause and prejudice standard is not a perfect safeguard against fundamental miscarriages of justice, the United States Supreme Court has recognized a narrow exception to the cause requirement where a constitutional violation has "probably resulted" in the conviction of one who is "actually innocent" of the substantive offense. *Dretke v. Haley*, 541 U.S. 386, 392 (2004) (citing *Murray v. Carrier*, 477 U.S. 478, 495–96 (1986)); *accord Lundgren v. Mitchell*, 440 F.3d 754, 764 (6th Cir. 2006).

## V. ANALYSIS

A. <u>Claims of Trial Court Error</u>

The petitioner claims that the trial court erred in admitting text message evidence and denying his motion for a new trial and that these erroneous rulings, "taken together," deprived him of his due process right to a fair trial. (Doc. No. 1 at 14.) However, he argues these allegedly erroneous rulings as separate subclaims, and the respondent responds by asserting that the subclaims are non-cognizable, were procedurally defaulted, and/or fail to demonstrate a violation of the petitioner's constitutional rights. The court addresses each subclaim below.

1. Evidentiary Ruling

The petitioner claims that "[t]he trial court erred in granting the State's [Tennessee Rule of Evidence] 404(b) motion argued on April 5, 2011 regarding the admission of text messages in relation to the offense, which were outside the scope of the conspiracy" because they were sent prior to the dates of the conspiracy alleged in the indictment. (Doc. No. 1 at 14.) The messages at issue were dated between August 2008 and January 2009, while the indictment referred to a conspiracy that existed between "January 2009 and March 2009." (*Id.* at 15; Doc. No. 12-1 at 6.) The petitioner claims that the earlier text messages, introduced by the state as evidence of prior bad acts under Rule 404(b), were admitted without regard to whether they were offered for a proper

18

purpose relative to the material issues subject to proof, and without consideration of whether their probative value outweighed the prejudicial effect of their admission. In response, the respondent argues that this claim, asserting the state court's misapplication of a state rule of evidence, is not cognizable in this federal habeas proceeding.

The respondent is correct. In support of his claim, the petitioner cites Sixth Circuit cases applying Federal Rule of Evidence 404(b). (*See* Doc. No. 1 at 16–17.) But "the Federal Rules of Evidence clearly are not applicable in a criminal trial in state court," and a claim based solely on the application of a state evidentiary rule "is a purely state law issue that is not cognizable in a federal habeas proceeding." *Allen v. Parris*, No. 2:15-CV-23-JRG-MCLC, 2018 WL 1595784, at *6 (E.D. Tenn. Mar. 30, 2018), *aff'd*, 795 F. App'x 946 (6th Cir. 2019). As the respondent points out, the petitioner presented this claim to the TCCA as an issue of state law only, and the TCCA decided the claim as such. *See Dunkley*, 2014 WL 2902257, at *13–15.[2] The petitioner is thus not entitled to federal habeas review of this claim.

---

[2]      The TCCA found as follows:

> We conclude that text messages between Ms. Frame and Defendant Dunkley provided a background of their romantic relationship, which was indicative of motive to kill Defendant Dunkley's wife. In the months leading up to the date alleged on the indictment, text messages were exchanged about Defendant Dunkley wanting to choke and kill Ms. Dunkley. The charge of conspiracy required the State to prove that Defendant Dunkley had the culpable mental state to commit the offense and that he entered into an agreement, however informal, with Ms. Frame and/or Defendant Miller. The text messages about Defendant Dunkley wanting to kill his wife, their marital troubles, and his efforts to procure money to pay for the weapon or to pay another person to do the killing is evidence that Defendant Dunkley had the intent to carry out the murder. Thus, we agree with the trial court's determination that this evidence was admissible under the purposes of Rule 404(b).

*Dunkley*, 2014 WL 2902257, at *15.

### 2. Denial of New Trial Based on Evidence Preponderating Against the Verdict

The petitioner claims that the trial court erroneously failed to set aside the jury verdict against him "as the 13th juror, pursuant to Rule 33(d)" of the Tennessee Rules of Criminal Procedure. (Doc. No. 1 at 18.) However, this claim is explicitly a matter of state procedural law that is not cognizable on habeas review, unless it is properly construed as challenging the sufficiency of the evidence. *See Nash v. Eberlin*, 258 F. App'x 761, 764 n.4 (6th Cir. 2007) (liberally construing "a manifest-weight-of-the-evidence argument" under state law as "a complaint that the state court erroneously found his conviction to be supported by sufficient evidence"); *see also*, *e.g.*, *Young v. Colson*, No. 3:12-cv-00304, 2015 WL 9581768, at *28 (M.D. Tenn. Dec. 30, 2015) (dismissing 13th juror claim under Tennessee Criminal Rule 33 as "aris[ing] under and . . . controlled by state law"). The petitioner has asserted a separate sufficiency-of-the-evidence claim, discussed below. This claim, therefore, is deemed to be purely a matter of state law and is not a viable habeas claim.

### 3. Denial of New Trial Based on New Evidence

The petitioner claims that, five months after testifying at his trial, Stephanie Frame made statements at her parole hearing that were inconsistent with her trial testimony and that the trial court erred in denying the petitioner's motion for a new trial in order to resolve these new, inconsistent statements by the state's key witness. The trial court held a hearing on the petitioner's motion for new trial (Doc. No. 12-19 at 128–181), at which Frame was called to testify concerning her subsequent statements at her parole hearing. Frame essentially testified that she informed the parole hearing officer that, while she had previously known of the conspiracy between the petitioner and Mr. Miller, it was not until August 2008 that she became actively involved as a co-conspirator by facilitating communications between the two men. (*See id.* at 138.) It is the

petitioner's position that Frame's parole hearing testimony was at odds with her trial testimony because it "effectively minimized her involvement in the conspiracy, . . . contrary to her [trial] testimony wherein she portrayed herself as being the center of the conspiracy discussions that she alleged occurred between the [petitioner] and Miller." (Doc. No. 1 at 20.)

This claim of error is asserted in the petition as a state court error that violated the petitioner's Sixth Amendment right to confront the primary witness against him. (Doc. No. 1 at 21.) However, the claim was not presented in this way to the trial court, where the petitioner argued his entitlement to a new trial based on "newly discovered evidence." (Doc. No. 12-3 at 79.) In ruling on this claim, the trial court found as follows:

> The Court finds that the evidence presented at the motion for a new trial is not new evidence. The defendant refers to a summary of involvement by defendant Frame provided to the parole board which occurred five months after trial and consisted of a few minutes of statements. At trial, the witness testified for approximately six hours and was cross-examined by defense counsel as to her testimony. Furthermore, the testimony provided at the motion for a new trial is not newly discovered evidence. At most, the statements provide a basis for impeachment, but that opportunity has already been provided to the defendant at trial through cross examination. The parole hearing testimony does not differ as to the defendant's role in this incident. The Court denies the motion for a new trial on this basis.

(*Id.* at 100.) The TCCA affirmed this determination, citing the state-law standard for a showing of "entitle[ment] to a new trial on the basis of newly discovered evidence" and finding that "Ms. Frame's testimony at the parole hearing is not newly discovered evidence," nor did the petitioner "provide a basis for establishing that the allegedly contradictory testimony was material or that it would change the outcome of his trial." *Dunkley*, 2014 WL 2902257, at *17. Thus, to the extent that the petitioner bases his claim in this court on the state courts' denial of a new trial based on newly discovered evidence that was "substantially different from [the] sworn testimony at trial" (Doc. No. 1 at 14), he asks this court "to reexamine state-court determinations on state-law

questions," which "is not [within] the province of a federal habeas court." *Estelle v. McGuire*, 502 U.S. 62, 67–68 (1991).

Insofar as the petitioner claims that he was denied his Sixth Amendment right "materially . . . to confront and cross-examine the primary witness against him" (Doc. No. 1 at 21)—an argument that was raised before the TCCA (*see* Doc. No. 12-22 at 29) but not addressed by that court—that claim fails on the merits. "Sixth Amendment jurisprudence leaves no question about a criminal defendant's right under the Confrontation Clause to 'impeach, i.e., discredit, the [state's] witness[es],'" *Blackston v. Rapelje*, 780 F.3d 340, 348–49 (6th Cir. 2015) (quoting *Davis v. Alaska*, 415 U.S. 308, 316 (1974)), and "a witness's own inconsistent statements, including recantations of prior inculpatory testimony, undeniably bear on [the] witness's bias and credibility." *Id.* at 353. But the petitioner has not cited, nor is the court aware of, any authority for the proposition that this right extends to statements made months after the witness testified and was thoroughly cross-examined at trial, except in situations where there is a second trial that follows the inconsistent testimony, as in *Blackston*. In that case, the Sixth Circuit affirmed the grant of the writ, finding that the habeas petitioner's confrontation and due process rights were violated when the trial court excluded the out-of-court statements of key prosecution witnesses at the petitioner's retrial, in the following circumstances:

> Before the second trial was held, two of the state's key witnesses recanted their testimony. Because those witnesses were later determined to be unavailable at the new trial, the court ordered their earlier testimony read to the jury, while at the same time denying Blackston the right to impeach their testimony with evidence of their subsequent recantations.

780 F.3d at 344.

Such procedural circumstances are not present in this case. Even if they were—and leaving aside the fact that Frame did not recant, but allegedly minimized her early involvement in the

conspiracy (as might be expected at her parole hearing)—the petitioner must establish as a threshold matter "that the statements are indeed inconsistent." *United States v. Hale*, 422 U.S. 171, 176 (1975) (citing 3A J. Wigmore, Evidence § 1040 (J. Chadbourn rev. 1970)). The state courts were not persuaded of such inconsistency, as the TCCA made clear when it agreed with the state "that the trial court properly found that Ms. Frame's testimony at the parole hearing did not 'significantly differ' from her testimony at trial" but was a mere "summary of her six hour trial testimony." *Dunkley*, 2014 WL 2902257, at *16–17. These findings of fact made by the state courts are presumed correct, a presumption the petitioner can rebut only by showing clear and convincing evidence to the contrary. 28 U.S.C. § 2254(e)(1). The petitioner has failed to make such a showing, or to demonstrate that the state courts' adjudication of this claim resulted in a decision that was contrary to federal law or based on an unreasonable determination of the facts. *Id.* § 2254(d). Accordingly, the court finds no grounds for habeas relief on this claim.

As for the petitioner's claim that the three instances of trial court error addressed above had the combined effect of denying him a fair trial, such claims based on cumulative prejudice from rulings that do not individually support habeas relief are not cognizable under Section 2254. *Moore v. Parker*, 425 F.3d 250, 256 (6th Cir. 2005). The court thus finds it unnecessary to analyze the parties' arguments over whether the petitioner's failure to present this overarching, due process-based claim to the state courts amounted to procedural default that is excused by appellate counsel's ineffectiveness in failing to "federalize" these claims. (*See* Doc. No. 16 at 6–7; Doc. Nos. 18, 22.)

B. Sufficiency of the Evidence

The petitioner challenges the sufficiency of the evidence supporting his conviction. Specifically, he argues that there was insufficient proof of his participation in Frame, Miller, and

Chestnut's conspiracy to kill the victim because the most damaging proof against him came directly or indirectly from Frame, "and yet much of her testimony regarding the alleged texts from the [petitioner] and the alleged communications between [him] and William Miller w[as] speculative." (Doc. No. 1 at 22–25.)

The TCCA properly stated the applicable standard as "whether, after considering the evidence in the light most favorable to the State, '*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Dunkley*, 2014 WL 2902257, at *17 (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). In accord with this standard, "a reviewing court 'faced with a record of historical facts that supports conflicting inferences must presume— even if it does not affirmatively appear in the record—that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution.'" *Cavazos v. Smith*, 565 U.S. 1, 6 (2011) (quoting *Jackson*, 443 U.S. at 326)). Thus, a federal habeas court must resist substituting its own opinion for that of the convicting jury, *York v. Tate*, 858 F.2d 322, 329 (6th Cir. 1988), particularly when it comes to matters of witness credibility, which "is an issue to be left solely within the province of the jury." *Knighton v. Mills*, No. 3:07-cv-2, 2011 WL 3843696, at *6 (E.D. Tenn. Aug. 29, 2011) (citing, *e.g.*, *Deel v. Jago*, 967 F.2d 1079, 1086 (6th Cir. 1992)).

In addition to this requirement of deference to the jury verdict concerning the substantive elements of the crime under state law, this court must defer to the TCCA's consideration of that verdict under AEDPA. *See Tucker v. Palmer*, 541 F.3d 652, 656 (6th Cir. 2008) (stating that "the law commands deference at two levels" when adjudicating sufficiency-of-the-evidence claim). Here, the TCCA set out the elements of first-degree murder under Tenn. Code Ann. § 39-13-

202(a)(1),[3] and of conspiracy under Tenn. Code Ann. § 39-12-103.[4] *Dunkley*, 2014 WL 2902257, at \*19–20 (reciting statutory elements and noting that "[t]he essential feature of the crime of conspiracy is the accord–the agreement to accomplish a criminal or unlawful act," which "may, and often will be, proven by circumstantial evidence"). It then considered the sufficiency of the proof of those elements, as follows:

> The evidence, in the light most favorable to the State, established that Defendant Dunkley and Ms. Frame were lovers for two and a half years and both desired the elimination of the victim, Ms. Dunkley. Defendant Dunkley and Ms. Frame discussed via text message various plans to murder Ms. Dunkley, and Defendant Dunkley provided Defendant Miller with a weapon. Defendant Dunkley provided information to Ms. Frame and Defendant Miller about Ms. Dunkley's work schedule, the premises in and around her work building, and what vehicles she drove. Transcripts of the text messages show that Defendant Dunkley made many references throughout to killing Ms. Dunkley, such as she was on "borrowed time" and was going to be "taken out." Defendant Dunkley sent text messages to Ms. Frame expressing his frustration with Ms. Dunkley and stating that he needed Ms. Dunkley to be killed before things got "bad." Defendant Dunkley planned to pay Defendant Miller with money he collected from the life insurance policies.

> The evidence that corroborates Ms. Frame's testimony is Ms. Dunkley's testimony, the transcripts of the text messages, the insurance agent's testimony, and Mr. Sherrell's testimony.[5] A cellular telephone records custodian testified that the text messages sent to Ms. Frame discussing killing Ms. Dunkley came from a telephone number registered to Defendant Dunkley. Ms. Dunkley testified that she and Defendant Dunkley were in the process of divorcing in early 2009 and that she had requested the divorce court to award her one of Defendant Dunkley's vehicles after

---

[3]     First-degree murder is the "premeditated and intentional killing of another," and "'premeditation' is an act done after the exercise of reflection and judgment." Tenn. Code. Ann. § 39-13-202(a)(1), (d).

[4]     "The offense of conspiracy is committed if two (2) or more people, each having the culpable mental state required for the offense that is the object of the conspiracy, and each acting for the purpose of promoting or facilitating commission of an offense, agree that one (1) or more of them will engage in conduct that constitutes the offense." Tenn. Code Ann. § 39-12-103(a). A person may be convicted of conspiracy only if "an overt act in pursuance of the conspiracy is alleged and proved to have been done by the person or by another with whom the person conspired." *Id.* § 39-12-103(d).

[5]     Mr. Sherell was a friend of Brian and Kristi Dunkley during their marriage, who later became romantically involved with Kristi Dunkley.

hers was repossessed. This testimony corroborates Ms. Frame's statement that Defendant Dunkley wanted Ms. Dunkley killed within a certain time frame, before their divorce situation "got bad." Ms. Dunkley also testified that she was aware of Defendant Dunkley's sexual relationship with Ms. Frame, and that she and Defendant Dunkley had had an "ugly" marital separation in 2008, corroborating Ms. Frame's testimony that Defendant Dunkley had a motive to kill his wife. Ms. Dunkley testified that Defendant Dunkley owned several weapons and a holster, corroborating Ms. Frame's testimony that Defendant Dunkley had given Defendant Miller a weapon to use in the murder. An agent from State Farm Insurance Agency testified that Defendant Dunkley owned two insurance polic[ies] on Ms. Dunkley's life totaling $300,000, corroborating Ms. Frame's testimony that the insurance money would be used to pay Defendant Miller after he killed Ms. Dunkley, and further providing evidence of Defendant Dunkley's motive. Mr. Sherrell testified that he knew that Defendant Dunkley and Ms. Frame were in a sexual relationship while he was married to Ms. Dunkley.

Additional evidence supporting Defendant Dunkley's conviction for conspiracy is evidence of his motive to have a shared life with Ms. Frame and his potential financial gain from Ms. Dunkley's death. The text messages provide direct and circumstantial evidence that an accord existed, however informal or unspoken, between Defendant Dunkley, Ms. Frame, and Defendant Miller to kill Ms. Dunkley, and that they acted with the purpose of promoting or facilitating her murder. Defendant Dunkley committed overt acts in furtherance of the offense, stating that Ms. Dunkley needed to be killed, providing information regarding her schedule and whereabouts, providing a gun, and contributing money to pay Defendant Miller. Accordingly, we conclude that the evidence was sufficient for a jury [to] find beyond a reasonable doubt that Defendant Dunkley was guilty of conspiracy to commit first degree murder. Defendant Dunkley is not entitled to relief on this issue.

*Dunkley*, 2014 WL 2902257, at *20–21.

This court has reviewed the transcript of the petitioner's trial and finds that the TCCA's decision is supported in the record. This is not a close call; there is ample direct and circumstantial evidence of the petitioner's participation in a conspiracy to kill the victim, as described above and in Frame's testimony (Doc. No. 12-12) and the transcripts of their text messages (Doc. Nos. 12-16, 12-17, 12-18). In short, despite the petitioner's assertion that the record lacks reliable evidence of his involvement in the conspiracy, it is the province of the jury to determine the reliability of

witness testimony, and Frame's testimony was well corroborated.[6] Even if this court disagreed with the TCCA's finding of corroboration, the court may not rely on its own opinion of the weight due the testimonial and other evidence of the petitioner's involvement, but must defer to the jury's resolution of evidentiary conflicts. The evidence was plainly sufficient for a rational juror to find the elements of conspiracy to commit first-degree murder beyond a reasonable doubt. The petitioner's claim to the contrary is without merit.

### C. Ineffective Assistance of Counsel

The petitioner claims that his trial counsel rendered ineffective assistance by (1) failing to recommend that he accept the plea deal offered by the state; (2) failing to adequately argue her motions under *State v. Ferguson*, 2 S. W. 3d 912 (Tenn. 1999), based on lost or destroyed evidence; (3) failing to move to suppress the phone call data and text messages; (4) failing to move to suppress the phone data obtained by judicial subpoena; and (5) failing "to emphasize proof that would have rebutted the State's assertion that Petitioner was 'hovering' around Skyline hospital." (Doc. No. 16 at 5; Doc. No. 1.)

All federal claims of ineffective assistance of counsel are subject to the highly deferential two-prong standard of *Strickland v. Washington*, 466 U.S. 668 (1984), which asks: (1) whether counsel was deficient in representing the defendant; and (2) whether counsel's alleged deficiency prejudiced the defense so as to deprive the defendant of a fair trial. *Id.* at 687. To meet the first

---

[6]     It bears noting here that "[t]he rule that a conviction must be supported by more than the uncorroborated [testimony] of an accomplice is a state-law rule and not one of constitutional dimension." *Beaird v. Parris*, No. 3:14-cv-01970, 2015 WL 3970573, at *13 (M.D. Tenn. June 30, 2015) (citing *United States v. Gallo*, 763 F.2d 1504, 1518 (6th Cir. 1985)).

prong, a petitioner must establish that his attorney's representation "fell below an objective standard of reasonableness," and must overcome the "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that . . . the challenged action 'might be considered sound trial strategy.'" *Id.* at 688–89. The "prejudice" component of the claim "focuses on the question of whether counsel's deficient performance renders the result of the trial unreliable or the proceeding fundamentally unfair." *Lockhart v. Fretwell*, 506 U.S. 364, 372 (1993). Prejudice, under *Strickland*, requires showing that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.*

As discussed above, however, a federal court may not grant habeas relief on a claim that has been rejected on the merits by a state court, unless the petitioner shows that the state court's decision "was contrary to" law clearly established by the United States Supreme Court, or that it "involved an unreasonable application of" such law, or that it "was based on an unreasonable determination of the facts" in light of the record before the state court. 28 U.S.C. §§ 2254(d)(1) and (2); *Williams v. Taylor*, 529 U.S. 362, 412 (2000). Thus, when an exhausted claim of ineffective assistance of counsel is raised in a federal habeas petition, the question to be resolved is not whether the petitioner's counsel was ineffective. Rather, "[t]he pivotal question is whether the state court's application of the *Strickland* standard was unreasonable." *Harrington v. Richter*, 562 U.S. at 101. As the Supreme Court clarified in *Harrington*,

> This is different from asking whether defense counsel's performance fell below *Strickland*'s standard. Were that the inquiry, the analysis would be no different than if, for example, this Court were adjudicating a *Strickland* claim on direct review of a criminal conviction in a United States district court. Under AEDPA, though, it is

a necessary premise that the two questions are different. For purposes of § 2254(d)(1), an unreasonable application of federal law is different from an incorrect application of federal law. A state court must be granted a deference and latitude that are not in operation when the case involves review under the *Strickland* standard itself.

*Id.* (internal quotation marks and citation omitted). The TCCA correctly identified and summarized the *Strickland* standard applicable to the petitioner's claims of ineffective assistance. *Dunkley v. State*, M2016–00961–CCA–R3–PC, 2017 WL 2859008, at *6 (Tenn. Crim. App. July 5, 2017), *perm. app. denied* (Tenn. Nov. 16, 2017). Accordingly, the critical question is whether the state court applied *Strickland* reasonably in reaching its conclusions on each ground raised by the petitioner.

### 1. Plea Negotiations

The petitioner argues that "[t]he most crucial point in [his] case was the first day of the . . . trial, when trial counsel received the first and only offer to settle the Petitioner's case." (Doc. No. 1 at 28–29.) He asserts that, "[r]ather than engage in a meaningful discussion with Petitioner about the offer in light of the devastating trial proof," which included "an abundance of prejudicial text messages with no plausible innocent explanation," "trial counsel allowed the case to proceed to trial [when she] should have requested time to discuss the offer with the Petitioner and should have recommended that [he] accept the State's offer." (Doc. No. 1 at 29, 35.) He asserts that he would have accepted the offer of a 15-year sentence, and that his conviction should therefore be set aside so that he can "accept the plea bargain offered by the State." (*Id.* at 29, 36.)

The TCCA correctly stated that criminal defendants have a right to the effective assistance of counsel in the plea-bargaining process, citing *Lafler v. Cooper*, 566 U.S. 156 (2012). *Dunkley*, 2017 WL 2859008, at *6. Testimony as to what transpired during that process was introduced at the petitioner's post-conviction evidentiary hearing, and described by the TCCA as follows:

The Petitioner's testimony was that he did not know that the State had conveyed a plea offer. While trial counsel testified that she conveyed a plea offer to the Petitioner, the prosecutor testified that there was never an offer made by the State, and the trial court accredited the prosecutor's testimony. . . .

Trial counsel's recollection was that the State made a plea offer which she conveyed to the Petitioner. However, her testimony was that she offered the Petitioner no advice regarding any offer, despite her assessment of the State's proof as particularly strong and her belief that pleading guilty in exchange for a fifteen-year sentence would be in the Petitioner's best interest. During a five-minute discussion in which trial counsel conveyed the State's offer without any advice, the Petitioner indicated he would plead guilty in exchange for a six-year sentence. The post-conviction court found that no plea offer was extended by the State, but the parties agree that the State was willing to consider recommending a fifteen-year sentence in exchange for a guilty plea and that trial counsel offered the Petitioner no advice during her discussion with him, despite her opinion that he would benefit from the bargain. Given the standards outlined above, trial counsel's failure to offer any advice during plea negotiations was deficient.

*Id.* at *7.

After finding counsel's performance deficient, the TCCA examined the prejudice prong of this ineffective assistance claim, stating that, under *Lafler*, "the prejudice inquiry should address whether but for the ineffective advice of counsel there is a reasonable probability that the plea offer would have been presented to the court (i.e., that the defendant would have accepted the plea and the prosecution would not have withdrawn it in light of intervening circumstances)." *Id.* (citation and internal quotation marks omitted). Employing this standard, the TCCA determined that the petitioner could not demonstrate prejudice for the following reasons:

First, the Petitioner has not shown that the State actually made him an offer to reject. The post-conviction court credited the prosecutor's testimony that no offer was extended. Even if the Petitioner argues that trial counsel's deficiency consists of failing to persuade him to make the State an offer to plead guilty to the indicted offenses and serve fifteen years, the Petitioner cannot show prejudice. This is because the prejudice inquiry directs the court to determine whether there is "a reasonable probability that the plea offer would have been presented to the court." *Lafler*, 566 U.S. at 164; *see* [*State v.*] *Garrison*, 40 S.W.3d at 431–32 (concluding that there was no prejudice in failure to communicate a plea offer because the evidence indicated that the petitioner would have rejected the offer). Here, the Petitioner introduced proof that the State would have considered accepting a plea

30

to the indicted offenses and would have recommended the minimum sentence. The evidence also showed that one of the co-defendants had expressed an interest in a plea agreement. However, the prosecutor's testimony established that the State's acceptance of any plea would have been contingent on the approval of the victim and on an offer to plead guilty to the indicted offenses from both the co-defendants who were being tried contemporaneously with the Petitioner: Mr. Chestnut and Mr. Miller. The Petitioner introduced no proof that the second co-defendant or that the victim would have agreed to the plea agreements. Accordingly, he has failed to show a reasonable probability that the plea offer would have been presented to the trial court, and he cannot demonstrate prejudice.

*Id.*

The TCCA properly applied *Strickland* and *Lafler* in determining that it was not reasonably probable that, but for counsel's failure to advise the petitioner, the proceedings would have resulted in a plea agreement's being presented to the trial court. The petitioner argues that the TCCA should have presumed the prejudicial effect of counsel's deficient performance based on the 25-year sentence he ultimately received, compared to the 15-year term under discussion just prior to the beginning of trial and the petitioner's agreeableness at that time to serve 6 years. (Doc. No. 1 at 35–36; Doc. No. 16 at 9.) He further argues that the TCCA's application of *Lafler* was unreasonable because there is no reason to believe that the state would have withdrawn its plea offer, had counsel requested additional time to consider it, or that the trial court would have declined to accept the terms of any plea deal that had been presented. (*Id.*)

However, the TCCA explicitly based its conclusion on its factual finding that the state's offer to recommend the minimum sentence in exchange for a guilty plea was contingent upon the petitioner, Miller, Chestnut, and the victim's all agreeing to those terms. Having failed to present proof to the contrary, or proof that the victim, in particular, would have agreed to a minimum-sentence recommendation even if all defendants had agreed to plead guilty, the petitioner provided no grounds to establish that any plea agreement would have been presented to the trial court, even if counsel had persuaded him that it was in his individual interest to accept a 15-year sentence. *Cf.*

31

*Troglin v. Westbrooks*, No. 1:12-cv-41, 2014 WL 5810312, at *11 (E.D. Tenn. Nov. 7, 2014) (finding that state court did not unreasonably apply *Strickland* when it rejected ineffective assistance claim based on petitioner's failure to offer proof of prejudice during post-conviction proceedings) (citing *Martin v. Mitchell*, 280 F.3d 594, 608 (6th Cir. 2002)). Moreover, there *is* reason to believe that the state, with a strong case and ready to proceed on the morning of trial, would not at that point have been willing to delay the proceedings while the petitioner and his co-defendants explored whether they could agree to plead guilty. The TCCA reasonably applied *Strickland*'s prejudice standard in concluding from the record before it that the result of the proceeding would not have been different, even if counsel had given appropriate advice to the petitioner regarding the state's willingness to recommend a 15-year sentence. Under AEDPA, this ends the inquiry into this *Strickland* claim, regardless of whether this court may have adjudicated the claim differently. Habeas relief is not warranted based on counsel's failure to advise the petitioner to plead guilty.

### 2. Motions Based on Failure to Preserve G-1 Phone

The petitioner claims that counsel performed deficiently in arguing, under *State v. Ferguson*, the issue of the state's "failure to preserve the T-Mobile G-1 phone that was seized by police from Ms. Frame on March 2, 2009, but then returned to Ms. Frame's mother, Maggie Alderson, after police had performed some testing on the phone." (Doc. No. 1 at 38.) The TCCA described counsel's pretrial motions on this issue and affirmed the post-conviction trial court's finding that she had not performed deficiently, as follows:

> Trial counsel filed the initial *Ferguson* motions in November [2010] but, misunderstanding the burden of proof, she introduced no evidence at the hearing on the motions, and the motions were denied. Trial counsel then filed subsequent motions [in March 2011] relating to the loss of the G-1 telephone. She struck these motions, explaining that she had subpoenaed Ms. Frame's mother and stepfather and that they had produced the G-1 telephone on the morning of the hearing. She

32

acknowledged that the motions were a "fishing expedition" and that the theory that the G-1 telephone contained additional exculpatory data was "speculation." The Petitioner argues that the majority of the incriminating text messages came from the G-1 telephone and that the Petitioner was prejudiced by trial counsel's failure to adequately litigate the issue. The Petitioner's theory on post-conviction appears to be that Ms. Frame could have used an application to alter the text messages and that this application could have been discovered by a thorough examination of the cell phone. The post-conviction court found that counsel "effectively argue[d]" the motion and that the Petitioner failed to introduce evidence that the phone contained exculpatory evidence.

The post-conviction court found that trial counsel did not perform deficiently because she raised the *Ferguson* issue. Trial counsel did not introduce proof on the issue during the first hearing, and the motion was denied. The motion was based on alleged photographs, images, voicemails, and call logs which had not been downloaded by the State during the data extraction. We note that the record is not exactly clear regarding the events surrounding the second motion, but it appears that trial counsel struck the motion when the G-1 telephone was made available to the defense. The Petitioner does not argue that trial counsel was deficient in not testing the G-1 telephone once it was made available. Neither does the Petitioner allege that the G-1 telephone was missing data at the time that it became available to the defense. The record does not preponderate against the finding that trial counsel did not perform deficiently because she raised the loss of the G-1 telephone as an issue and apparently obtained the G-1 telephone for inspection prior to trial.

*Dunkley*, 2017 WL 2859008, at *8.

The TCCA proceeded to evaluate prejudice under *Strickland* and determined that the petitioner was not prejudiced by counsel's presentation of the *Ferguson* motions because (1) he "presented no evidence, beyond his own testimony, that such an application [used to fabricate text messages] existed and no evidence at all that such an application was present on [the G-1] cell phone"; (2) he acknowledged that the majority of the text messages on the phone were ones he had sent or received; (3) he does not allege that the G-1 cell phone was tainted when he obtained it; (4) he acknowledged that text messages on the G-1 cell phone would have been present on his own cell phone had he not actively deleted them; and (5) "the 'shadow' telephone also contained numerous incriminating te[x]t messages which established the Petitioner's participation in the plot." *Id.* at *9.

The petitioner argues that deficient performance is established by counsel's admission to not initially understanding her burden of proof with regard to the *Ferguson* motions and her failure to build a record of the "potentially exculpatory evidence [that] was forever lost" when the state returned the G-1 phone to Frame's mother, rather than retaining custody of it after data extraction. (Doc. No. 1 at 40.) But as the state courts observed, counsel raised the *Ferguson* issue, pursued it after the initial denial of her motion, and eventually obtained the G-1 phone, which is not alleged to have been missing any identifiable data or to have contained data that was a surprise to the petitioner. These factors were reasonably cited as grounds for finding no deficient performance or prejudice.

The petitioner's remaining argument on this claim is that, due to the state's failure to retain custody of the phone, he was deprived of the ability to ascertain whether text messages stored on the phone may have been fabricated or altered so as to remove potentially exculpatory material, in a way that would not have been apparent to counsel when the phone was subsequently produced to her. The TCCA dispatched this final contention by reasonably determining that, in the absence of any grounds for believing that the contents of the phone had in fact been fabricated or altered, counsel's failure to assert such a speculative theory did not render her performance deficient nor did it result in prejudice to the petitioner. *Dunkley*, 2017 WL 2859008, at *9. While the petitioner now contends that competent counsel would have pursued this argument by, e.g., "call[ing] an expert to state what information could have been gleaned from the phone had it been preserved" (Doc. No. 1 at 40), the TCCA found that his claim based on counsel's failure to pursue a tainted evidence theory was doomed by the failure to present any proof, beyond his own post-conviction testimony, that the phone's contents could have been altered in a way that "would have undermined the corroborating evidence involving him in the plot." *Dunkley*, 2017 WL 2859008, at *9. This

was a reasonable application of *Strickland*'s prejudice standard. *See Troglin*, 2014 WL 5810312, at *11 ("Given petitioner's failure to offer testimony at the post-conviction hearing to demonstrate prejudice flowed from the absence of expert testimony at trial, the state court did not unreasonably apply *Strickland* when it rejected this claim.").

This court finds that the TCCA's decision on this claim reasonably applied *Strickland* and that the petitioner is therefore not entitled to habeas relief.

### 3. Failure to Challenge Admissibility of Data Obtained Through Search Warrants

The petitioner claims that counsel failed to move to suppress the data extracted from Frame's cell phones on grounds of a defect in the search warrants and that this decision, following counsel's failure to pursue her *Ferguson* motions after receiving the G-1 phone, meant that she knew that the damaging text messages would come into evidence and should therefore have pressed the petitioner to begin plea negotiations. (Doc. No. 1 at 36–37, 41.) The TCCA considered this claim as follows:

> The Petitioner next asserts that trial counsel should have challenged the search warrants related to Ms. Frame's telephones. The Petitioner, however, concedes in his brief that he cannot show deficiency or prejudice on this issue based on lack of standing to challenge the warrants. Instead, he asserts that this evidence should have spurred trial counsel to negotiate a plea agreement. Accordingly, we conclude that the Petitioner is not entitled to relief based on trial counsel's failure to file a motion to suppress these records, and we have already determined above that the Petitioner has not demonstrated prejudice from trial counsel's failure to advise the Petitioner to extend a plea offer to the State.

*Dunkley*, 2017 WL 2859008, at *9. Petitioner rightly conceded his lack of standing to challenge the warrants to search Frame's phones, as he had no privacy interest in those phones protected by the Fourth Amendment. *See United States v. Hopper*, 58 F. App'x 619, 624 (6th Cir. 2003) (stating that "suppression of the product of a Fourth Amendment violation can be successfully urged only by those whose rights were violated by the search itself, not by those who are aggrieved solely by

the introduction of damaging evidence"). The TCCA's resolution of this issue was reasonable. Habeas relief is not warranted on this ineffective assistance claim.

### 4. Failure to Challenge Judicial Subpoenas for Cell Phone Data

The petitioner claims that counsel was ineffective in failing to challenge the data obtained via subpoena of his telephone records, based on the insufficiency of the affidavits supporting the subpoena requests. After reciting the state statutory requirements for a proper affidavit in support of a subpoena request, *see* Tenn. Code Ann. § 40-17-123(c), the TCCA found that the petitioner could not show prejudice resulting from counsel's failure to challenge the subpoenas, agreeing with the state that, even if the affidavits in support of the subpoenas had been found defective, the state could have simply cured the defect and obtained new subpoenas. *Dunkley*, 2017 WL 2859008, at *10. The TCCA additionally found as follows:

> Moreover, the Petitioner cannot demonstrate a reasonable probability that the outcome of the proceeding would have been different even if the records had been suppressed. At trial, the State introduced the recorded conversations between Ms. Frame and Mr. Marshall to show that Ms. Frame was attempting to hire Mr. Marshall to murder the victim. Mr. Marshall's testimony and the gun and other items Ms. Frame gave him were also introduced at trial. Ms. Frame testified that she attempted to procure the murder at the behest of the Petitioner, who was in the process of divorcing the victim. Ms. Frame's cell phone records were the source of the corroborating information which trial counsel described as "damning." The records extracted from Ms. Frame's G-1 and "shadow" phones contained the substance of numerous text messages in which the Petitioner solicited or referenced the murder of his wife. The records obtained from Ms. Frame's service provider confirmed many points of contact between her telephone number and the Petitioner's. The Petitioner's subpoenaed telephone records did not reveal the substance of any written or oral communication but only confirmed that his telephone had been involved in points of contact with Ms. Frame's telephone number. This evidence, which was largely already confirmed through Ms. Frame's service provider, was of marginal value at trial. Accordingly, the Petitioner cannot show prejudice.

*Id.*

While the petitioner argues at length over Detective Tarkington's failure to comply with Section 40-17-123(c) and the likelihood that a motion to suppress the subpoenaed records would have been granted (Doc. No. 1 at 42–44), he does not argue that the TCCA's finding of no resulting prejudice was based on an unreasonable application of *Strickland* or an unreasonable determination of the facts in light of the evidence of record. Because this court finds that the TCCA's determination that the petitioner was not prejudiced by any deficient performance in this regard was eminently reasonable, habeas relief is not warranted on this claim.

### 5. Failure to Challenge Proof of Presence at Skyline Hospital

The petitioner claims that counsel was ineffective in failing to effectively rebut the state's assertion that he was in the area of Skyline Hospital on the night that Frame was arrested in the hospital parking lot. The petitioner claims that the post-conviction record contains location data from his cellular service provider establishing that his cell phone was not in the area of Skyline Hospital on that night, contrary to the state's suggestion from witness testimony that a black Hummer such as the one owned by the petitioner was seen "hovering around Skyline Hospital." (Doc. No. 1 at 45.) He states that counsel should have emphasized these records of his cell phone's location to rebut the state's evidence and argument placing him at Skyline Hospital, where he was allegedly present "to ensure that the conspiracy materialized." (*Id.*) More importantly, the petitioner claims that "[t]rial counsel should have introduced witness testimony" to rebut the state's position—the testimony of Ms. Williams-Dunkley, who could have "plac[ed] Mr. Dunkley and the Hummer at his house and NOT at Skyline Hospital." (*Id.*)

As recounted by the TCCA,

The Petitioner asserted at the hearing that Ms. Williams-Dunkley could have testified to his whereabouts and to the fact that he was not driving his Hummer because he had made it over to her use. Trial counsel noted that she had cross-examined the State's witnesses to establish that the vehicle was popular, and she

37

stated that there had been some evidence in the telephone records that the Petitioner's telephone was using a cellular tower in Goodlettsville, which is located a few miles north of Skyline hospital. She testified that she did not call Ms. Williams-Dunkley due to Ms. Williams-Dunkley's credibility issues, which were then detailed by Detective Tarkington. The post-conviction court found that the decision not to call Ms. Williams-Dunkley was reasonable trial strategy and that the telephone records documenting the Petitioner's location were before the jury.

*Dunkley*, 2017 WL 2859008, at *11. The TCCA affirmed the post-conviction trial court's findings, stating that the petitioner's failure to offer Ms. Williams-Dunkley's testimony at the post-conviction evidentiary hearing precluded a showing of prejudice from counsel's failure to call her as a trial witness; that counsel did not perform deficiently in failing to call Ms. Williams-Dunkley as a trial witness, given her known credibility issues; that the cellular tower evidence was not conclusive with regard to the petitioner's cellular telephone being outside the vicinity of the hospital at the time that Frame was arrested; and that "the Petitioner's presence at or absence from the hospital was not material to his prosecution" in any event, because "his conviction was based on the testimony of Ms. Frame and the numerous text messages indicating his desire to have his wife murdered and his solicitation of others to achieve that end." *Id.* For these reasons, the TCCA found that the petitioner could not establish deficient performance or prejudice under *Strickland*. Because this was a reasonable application of *Strickland*, the petitioner is not entitled to habeas relief on this claim.

D. Cumulative Prejudice

Finally, the petitioner argues that the court must consider the cumulative prejudicial effect of "all the grounds dealing with court errors, insufficient evidence to convict, and ineffective assistance of counsel" when deciding whether he is entitled to habeas relief. (Doc. No. 1 at 46.) However, as the court previously noted, claims based on cumulative prejudice from rulings that

38

do not individually support habeas relief are not cognizable under Section 2254. *Moore v. Parker*, 425 F.3d 250, 256 (6th Cir. 2005).

## VI. CONCLUSION

For the foregoing reasons, the habeas corpus petition will be denied and this matter will be dismissed with prejudice.

The court must issue or deny a certificate of appealability ("COA") when it enters a final order adverse to a Section 2254 petitioner. Rule 11, Rules Gov'g § 2254 Cases. A petitioner may not take an appeal unless a district or circuit judge issues a COA. 28 U.S.C. § 2253(c)(1); Fed. R. App. P. 22(b)(1). A COA may issue only if the petitioner "has made a substantial showing of the denial of a constitutional right," 28 U.S.C. § 2253(c)(2). A "substantial showing" is made when the petitioner demonstrates that "reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 336 (2003) (citations and internal quotation marks omitted). "[A] COA does not require a showing that the appeal will succeed," but courts should not issue a COA as a matter of course. *Id.* at 337.

Because reasonable jurists could not debate whether the petitioner's claims should have been resolved differently or are deserving of encouragement to proceed further, the court will deny a COA. The petitioner may seek a COA directly from the Sixth Circuit Court of Appeals, Rule 11(a), Rules Gov'g § 2254 Cases.

An appropriate order is filed herewith.

_____
Aleta A. Trauger
United States District Judge

39